## APPEAL OF THOMAS S. LEWIS.

### [ESTATE OF JOHN L. LEWIS.]

#### FROM THE DECREE OF THE ORPHANS' COURT OF UNION COUNTY.

Argued May 15, 1889—Decided May 27, 1889.

The finding of an auditor, that an heir at law had been advanced by the decedent in the purchase of a farm the deed for which was made directly to the son, being based upon sufficient evidence and approved by the court, the decree confirming the report, etc., will not be reversed.

Before PAXSON, C. J., GREEN, CLARK, WILLIAMS and Mc-COLLUM, JJ.

No. 434 January Term 1889, Sup. Ct.; court below, number and term not given.

On May 20, 1869, John L. Lewis died intestate, leaving no widow but five children, as his heirs at law.  After unsuccessful proceedings by bill in equity to enforce an alleged family arrangement and disposition of the property, partition proceedings were instituted in the Orphans' Court, wherein the real estate of the decedent was divided, accepted at the valuation by certain heirs entitled, and awarded to them by formal decrees, upon their entering into recognizances conditioned to pay the costs of partition and the amount of owelty due to Thomas S. Lewis, to whom no award of land was made.  Thereupon, one of the acceptors came into court and filed a petition setting forth that Thomas S. Lewis, in the lifetime of his father, had been advanced by the latter in the purchase of two parcels of real estate.  One of these parcels was known as the Kelly farm which, as was alleged, had been purchased by John L. Lewis in his lifetime for $6,594, all of the purchase money being paid by him, except $1,800 remaining as a dower principal for the protection of the widow of Joseph Kelly, deceased, and the deed made to Thomas S. Lewis.

On September 24, 1887, *Mr. Alfred Hayes* was appointed

auditor to ascertain, inter alia, "as to whether there be any owelty due Thomas S. Lewis, as one of the heirs of John S. Lewis, deceased, after the advancements shall be duly charged." On September 17, 1888, the auditor submitted his report, which so far as relating to the subject matter of this cause, was as follows:

\*     \*     \*     \*     \*     \*     \*     \*

Considering these questions in their order, the first matter for determination is whether any advancements were made to the heirs of John L. Lewis by said decedent in his lifetime, and if so to whom, and to what extent.

An advancement is defined to be "a pure and irrevocable gift by a parent in his lifetime to his child, on account of such child's share of the estate after the parent's decease:" Brightly's Eq., 389. "An advancement is an irrevocable gift by a parent to a child of the whole or part of what it is supposed the child will be entitled to on the death of the parent intestate:" Eshleman's App., 74 Pa. 42. "Advancement is a question of intent. That intent must be proven to have existed at the time of the transaction and by the contemporary acts and declarations of the parties:" Merkel's App., 89 Pa. 340. If a parent purchase land in the name of his son, it is prima facie an advancement: Phillips v. Gregg, 10 W. 158. "Where a father conveys land to a child it is prima facie an advancement, and this question may be settled after a partition of the father's remaining real estate, in the distribution of the value thereof:" Dutch's App., 57 Pa. 461. "Where real estate is conveyed by a father to a child, the legal presumption is that it is intended to be an advancement. To overbear this presumption there must be proof of distinct explanatory facts. Thus, it was ruled in Dutch's App., 57 Pa. 461, that a conveyance of land by a father to a child directly, or by payment of the purchase money and having the deed made to the child, is prima facie an advancement, and this presumption is greatly strengthened when the value of the land bears any considerable proportion to the father's whole estate:" Storey's App., 83 Pa. 97. "In the absence of direct evidence accompanying a gift, the question of advancement must be determined from a consideration of the surrounding facts:" Knabb's Estate, 30 Leg. Int. 361. A difference seems to be recognized between advancements in

land and advancements in money, as to their proof. "If a parent conveys land to the child from considerations of love and affection only, or pays the purchase money of land conveyed by another to the child, the law presumes it an advancement though not conclusively; but where personal chattels or money are delivered to the child or paid for him, there must be evidence of an intention to make an advancement beyond the unexplained act of delivery or payment:" Miller's App., 40 Pa. 61.

*    *    *    *    *    *    *    *

It is possible that John L. Lewis paid all the purchase money of the Clingan farm with his own funds, but it is also possible that he did not do so. To say the least, there is manifestly an insufficiency of evidence to warrant a finding that the undivided one half of the Clingan farm was an advancement to Thomas S. Lewis, and the auditor therefore concludes that it was not.

We now come to a consideration of the same question, as it relates to the Kelly farm.

It is to be borne in mind that the declarations made by the father, at the time the alleged advancement was made, are competent and extremely important in a determination of the question involved; and nothing is better settled than that the subsequent acts and declarations of the parent cannot be admitted as evidence in his favor, although those of the child may be so used: See King's Est., 6 Wh. 370; Miller's App., 40 Pa. 57; Yundt's App., 13 Pa. 575; Batton v. Allen, 43 Am. Dec. 630.

The only declarations and acts of John L. Lewis which seem to be contemporaneous with the alleged advancement and part of the res gestæ are those testified to by Rev. S. W. Ziegler and by Philip Stahl, the administrator of the estate of Joseph Kelly, deceased.

In his testimony taken by the master in the equity proceedings the former says: " In the spring of 1861, the Joseph Kelly place was for sale. Thomas Lewis was desirous of having it and asked his father to buy it for him, giving as a reason that it had good timber on it, and a saw mill on which more could be made than on the farm. He talked also of leaving him if he did not get it. Father told him and I to go out and bid on it, not to bid too high. We went out and attended the sale

and bid it in for $31.40 per acre. We thought we had a bargain." In the present audit he testifies: "When the Kelly farm was purchased I was along. Thomas S. Lewis was with me. I had orders and instructions from John L. Lewis as to that purchase. The instructions were to both Thomas S. and myself. He told us to go out and bid, but not to go too high. Thomas did the bidding; we consulted together. There were a number of bids. We finally went to $31.40 per acre. We bought it for John L. Lewis. John L. Lewis paid for it. The deed was made to Thomas S. Lewis." On cross examination, he states that he was present once at James F. Linn's office when John L. Lewis made a large payment of the purchase money of the farm.

Philip Stahl says: "About a week before the sale John L. Lewis and Thomas S. Lewis came out and saw me, and said that he wanted to buy a farm for his son Thomas, or Tommy, as he called him. John L. Lewis was the purchaser, his son and son-in-law were at the sale and gave in the name of John L. Lewis as the purchaser. . . . . . The deed was made to his son Tommy and John L. Lewis paid the money." He also states that all the purchase money that was paid was paid to him in the office of James F. Linn, Esq., and that it was all paid except the dower. Speaking of the payment of $2,000, by John L. Lewis, at James F. Linn's office, he says that Mr. Thomas S. Lewis was present; "I don't know where Mr. Lewis said he had got that money, but I understood him that he had sold property up in Centre county, and had got the money there."

\*     \*     \*     \*     \*     \*     \*     \*

The return of sale by Philip Stahl to the Orphans' Court; the deed for the Kelly farm; the obligations given for the purchase money unpaid; the securing of the widow's dower, $1,802.71 (yet unpaid), disclose the name of Thomas S. Lewis alone as vendee and obligor, but there is nothing in this which is inconsistent with the idea of the purchase of a farm by the father for the son. Nor does the auditor understand that it is essential to constitute an advancement in land, where the title is taken in the name of the son, that the whole amount of the purchase money must necessarily be paid by the parent. In Phillips v. Gregg, 10 W. 172, it is ruled that " if a parent pur-

chase land in the name of the son, and pay only part of the purchase money, it will not be pretended that the son is bound to bring into hotch-potch more than the amount paid."

\*    \*    \*    \*    \*    \*    \*    \*

In the opinion of the auditor, the testimony of Philip Stahl is the controlling evidence bearing upon the question of advancement, the other parol testimony upon that subject, as also that relative to admissions, being of a persuasive or corroboratory character.

The facts appear to show that Thomas S. Lewis was desirous of having the Kelly farm; that he insisted strongly upon his father buying it for him, even intimating to him that he would leave him if he did not get it; that John L. Lewis and his son Thomas called on Mr. Stahl before the sale, and the former told Mr. Stahl, who had the farm for sale, that he wanted to buy a farm for his son Tommy; that instructions were given by old Mr. Lewis to his son Thomas and his son-in-law Mr. Ziegler to go to the sale and bid upon the property; that they did attend the sale, and consulted together, Thomas doing the bidding, and that the farm was finally struck off at $31.40 per acre, and the name of John L. Lewis given in as the purchaser; that when the parties afterwards met at the office of James F. Linn, Esq., who was the attorney for Philip Stahl, the administrator, John L. Lewis who at that time was about 83 years of age, and his son Thomas S. Lewis came there together; that John L. Lewis paid all the purchase money as to the payment of which any direct testimony has been given, and stated that he was buying the land for Tommy, and had the deed made to Thomas S. Lewis.

These facts are sufficient, in connection with the persuasive evidence before referred to, in the opinion of the auditor, to raise the presumption, that whatever John L. Lewis paid of the purchase money of the Kelly farm, there was an advancement made to Thomas S. Lewis to that extent, and the burden lies upon Thomas to rebut this presumption, as ruled in Dutch's App., 57 Pa. 465.

Should it be claimed that under the facts there is a strong presumption that after the property was knocked off to John L. Lewis, as is the sworn testimony of both Mr. Stahl and Mr. Ziegler, arrangements were made between him and Thomas, by

which the latter became the purchaser, and that the money paid by the father was in reality the money of Thomas, it can be answered, that if this were so, the presence of John L. Lewis would hardly have been needed at the office of James F. Linn, Esq., and it would have been more likely that Thomas should have had the custody of his own money, rather than his aged and infirm father; besides, we meet the further objections springing from the testimony of Philip Stahl, in that the latter says: "I understood him, John L. Lewis, that he had sold property up in Centre county, and had got the money there."

Finding then that what John L. Lewis paid out of his own funds on the Kelly farm was an advancement to his son Thomas, the question recurs, how much of the purchase money did he so pay for him? The auditor would place the amount at $4,791.29, being the difference between the whole amount of the purchase money of the farm, to wit, $6,594, and the dower money yet unpaid, to wit, $1,802.71, if it were not for certain other testimony produced.

[Considering other testimony and documentary evidence adduced upon the subject of the amount paid in the purchase of the Kelly farm by John L. Lewis, the auditor concluded:]

The auditor is inclined to limit the amount which he finds to be an advancement, to such sum only as is clearly justified by the testimony; and therefore, as his conclusion, he finds that Thomas S. Lewis was advanced by his father John L. Lewis, in the farm known as the Kelly place, to the amount of $3,000.

To the report of the auditor made in accordance with the foregoing findings, Thomas S. Lewis filed exceptions, inter alia, that the auditor erred:

2. In finding as a matter of fact that Thomas S. Lewis was advanced $3,000 in the Kelly farm.[1]

3. In finding that Thomas S. Lewis was advanced to more than his share in the real estate, and not entitled to owelty in the recognizance.[2]

4. The auditor erred in not adding the personal estate to the fund from the real estate, and in not bringing the entire estate, both real and personal, into a hotch-potch, before dividing the estate into shares due the heirs, to ascertain if Thomas S. Lewis was advanced more than his share.

Said exceptions having been argued, they were dismissed on March 11, 1889, the court, BUCHER, P. J., saying:

A careful reading of the testimony, as well as the auditor's report, satisfies us, that the latter needs correction, in one particular only. The objection that "the auditor erred in not adding the personal estate to the fund from the real estate, and in not bringing the entire estate, both real and personal, into hotch-potch, before dividing the estate into shares due the heirs, to ascertain if Thomas S. Lewis was advanced more than his share," is not well taken. The auditor had nothing to do with the personal estate. The accounts of the administrators of the personal estate are not yet settled and determined, and it will be ample time to determine the interest of the parties in that fund when this is done. The sole question before the auditor, as to advancements, had relation to the real estate, and the report is only conclusive as to advancements, so far as the real estate is concerned.

Thereupon the exceptant took this appeal assigning as error:

1, 2. The dismissal of the foregoing exceptions.[1] [2]

3. The confirmation of the auditor's report.

*Mr. Andrew H. Dill* (with him *Mr. E. M. Beale*), for the appellant.

*Mr. Samuel H. Orwig* (with him *Mr. J. Merrill Linn*), for the appellees.

PER CURIAM:

The only question here is whether the auditor erred in finding that Thomas S. Lewis, the appellant, was advanced three thousand dollars in the purchase of the Kelly farm. This is a question of fact and the finding was against the appellant. The learned Orphans' Court sustained the auditor, and the case is now here upon appeal. We are asked to reverse both the court and the auditor upon a question of fact. It may be that the finding might have been the other way, but we are not prepared to say it should have been. There was evidence, and we think sufficient evidence, to sustain the finding.

The decree is affirmed and the appeal dismissed at the costs of the appellant.